## REEDER v. LOUISIANA WESTERN LUMBER CO.

### No. 1346.

Court of Appeal of Louisiana. First Circuit.

June 11, 1934.

M. R. Stewart, of Lake Charles, for appellant.

McCoy, Moss & King, of Lake Charles, for appellee.

LE BLANC, Judge.

This is a suit for compensation for total permanent disability arising out of an accident alleged to have happened on October 14, 1932, while plaintiff was engaged in his duties as a truck driver for the defendant company. In his petition, plaintiff avers that on the day stated, after having loaded his truck with lumber, he started to step up into the cab, and, in doing so, struck his head against the top of the door. He avers further that the point of impact on his head was at exactly the same spot where his skull had been fractured in the year 1929, and the implication is that the old wound was renewed and severely aggravated. He sets out that it resulted in his having to submit to an operation on his skull, and that he has been left totally and permanently disabled to do work of a reasonable character. He alleges that he was being paid $10 per week for his services at the time, and accordingly prays for compensation at the rate of $6.50 per week for 400 weeks.

The defendant for answer denies that plaintiff was employed as a truck driver as alleged by him, and that there was any such accident as he described having happened on October 14, 1932. It avers that his disability was the result of a growth that was causing a brain pressure brought about by the fracture of the skull in 1929, and that when this pressure was relieved by an operation he recovered therefrom.

The lower court rendered judgment in favor of the defendant rejecting the plaintiff's claim, and he has appealed.

During the winter of 1929 plaintiff, who was then employed by the defendant, sustained a severe skull injury which necessitated an operation. The operation consisted of opening the skull and removing fragments of broken bone and dirt from the brain, and some of the brain tissue itself. He recovered from that operation sufficiently to go back to work, being employed again by the defendant as one of its truck drivers. He worked regularly until April, 1932, when, because of business conditions, defendant found it necessary to diminish its force of employees, and he was let out. Some time in September of the same year he was taken on again, not as a truck driver, however, but as a general helper around the yard and at reduced wages. At that time there were two truck drivers em-

ployed; one, a white man named Joe Tyler, and the other a negro named Jesse Holliday. On the day that plaintiff claims to have sustained his injury, there were three deliveries of lumber by defendant's own trucks, according to tickets issued at the lumber yard. The testimony of the plaintiff is that he alone made four deliveries of lumber by truck that day, which of course cannot be reconciled with the fact as established by the records of the defendant and sworn to by those in active charge and management of its business. When pressed to recall and name the persons or firms to whom he had made these deliveries, plaintiff cannot remember a single one. All of this makes it highly improbable, therefore, that plaintiff drove or attempted to drive any truck loaded with lumber that day.

He testifies further that the accident occurred about 4 or 4:30 in the afternoon; that the impact left him groggy and dizzy; and that he sat down on the running board of the truck for five minutes before he had recovered enough to go out with the load of lumber. He states that he made the delivery, returned to the office of defendant, and then walked to his home. That night he became unconscious and doesn't remember anything from then on until after he was operated on again. He made no complaint to any one around the defendant's place of business either at the time he claims to have hurt himself or after he returned from delivering the load of lumber. He does say that there was no one at the office after he returned with the truck, but it is positive that there were several of defendant's office men and employees on the premises at the time he says he was hurt, and it is a bit significant that he would not have told some one about what had happened to him. The next day, Mr. Lysle Peters, vice president of the defendant company, called at plaintiff's home, having heard that he was sick. He says that he was rational and complained of suffering from a headache, but never mentioned anything about a recent accident. He called on him on other occasions before he was operated on and at least on two of such visits the plaintiff conversed with him and never said a thing about having struck his head on the top of a truck and injuring himself.

The testimony so far referred to casts a serious doubt over plaintiff's present account of an accidental injury and the results that followed. But were we inclined to favor him at all, the testimony of Dr. J. G. Martin, the physician and surgeon who operated on him on both occasions, compels us to resolve whatever doubt we entertain altogether against him.

Dr. Martin was called on to go to plaintiff's house the night he took sick and found him stupefied. His wife told him that he had had a convulsion. He treated him for several days, during which time the family reported that he was having two or three convulsions a day. He found no evidence of a recent trauma on his skull, and plaintiff complained of none, although he was apparently rational at times. He says that in 1929, when plaintiff sustained a compound fracture of the skull, the thick membrane which covers the brain was torn apart and destroyed, and there was nothing left to protect it but the scalp. He became satisfied on examining plaintiff this second time that his trouble was due to adhesions which had developed between the scalp and the brain. He gave him medicine to control the convulsions, but when he saw that it wasn't having the desired result he concluded that the only thing to do was to operate and remove the adhesions which caused the pressure on the brain. This he did, and plaintiff recovered. At the time of the trial of the case more than a year had elapsed since this second operation, and during that interval the doctor had not heard of a return of the symptoms indicated in plaintiff's condition before.

The result of the operation unquestionably confirmed Dr. Martin's diagnosis as to the adhesions being the cause of the convulsions, and in the absence of any medical proof whatsoever that there might have been any other cause resulting from trauma, we are forced to the conclusion that plaintiff did not sustain the injury he claims to have suffered on October 14, 1932, or that if he did have an accident that it was not the cause of his alleged disability.

The judgment appealed from properly rejected the claim for compensation, and it is therefore affirmed.